Todd E. Zenger (5238)
KIRTON McCONKIE
60 East South Temple, Suite 1800
Salt Lake City, Utah 84111
Phone: (801) 328-3600
Fax: (801) 321-4893
Email: tzenger@kmclaw.com

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| CAMPMAID, LLC, a Utah entity, KENNETH YOCUM, an individual<br><br>Plaintiff,<br><br>vs.<br><br>DARIN NEWELL, an individual, BOLD, INC., a Utah entity, and XNation, Inc., a Utah entity, and AMAZON.COM.<br><br>Defendants. | Civil Action No. 2:16-cv-406<br><br>Judge Bruce S. Jenkins<br><br><br>**MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Plaintiffs CampMaid LLC and Kenneth Yocum by motion request this court to temporarily restrain and preliminarily enjoin Defendants Darin Newell, Bold, Inc. and XNation, Inc. ("Newell Defendants") from further acts of patent infringement, trademark infringement, interference with economic relations and conversion.

## I.      <u>INTRODUCTION</u>

Plaintiffs are the owners of certain patent, trademark and trade rights related to the manufacture, importation, promotion, sale and distribution of dutch oven lid holder products and related accessories.  The Newell Defendants unlawful and unfair activities are irreparably harming Plaintiffs.

## II.     <u>SUCCINCT STATEMENT OF THE PRECISE RELIEF SOUGHT AND THE SPECIFIC GROUNDS THEREFORE</u>

By the instant Motion, CampMaid seeks a temporary restraining order and preliminary injunction immediately enjoining the Newell Defendants and any person or entities acting in concert with them from making, importing, using, selling, offering for sale, holding for sale, advertising, promoting and/or otherwise storing, in any manner, CampMaid's Genuine Product and accessories (as Genuine Product is defined below), including the immediate cessation of any and all Internet sales or liquidation sales dumping Genuine Product and accessories of CampMaid and an order preventing unauthorized Genuine Product from entering the United States through ports of the United States.

Plaintiff seek an order restraining the Newell Defendants or any persons or entities associated with them from providing any other Genuine Product and accessories or otherwise infringing product to Amazon.com and anyone selling via an account at Amazon.com.

CampMaid also seeks related immediate injunctive relief in relation to the Newell Defendants' withholding of product inventory, complete sales data and revenue from sales. Plaintiffs seek an order compelling delivery of all product inventory to CampMaid, production of complete and accurate sales data and deposit of revenue from sales into an account designated by CampMaid.

CampMaid seeks an order requiring the Newell Defendants to immediately pay CampMaid's manufacturer for all CampMaid products the Newell Defendants have received from CampMaid's manufacturer and to repay the loan Mr. Newell acquired from CampMaid's manufacturer.

Plaintiffs also seek an order restraining the Newell Defendants from communicating with CampMaid's manufacturer or other distributors, except as is necessary to effect full payment to CampMaid's manufacturer.

The Newell Defendant have been employing unauthorized, unlawful and prejudicially unfair business practices resulting in damages and irreparable harm to Plaintiffs. These practices include sales contrary to the business practices of CampMaid, infringement, false and misleading statement of fact and threats.

Federal Rule of Civil Procedure 65 authorizes such relief where, as here, (1) CampMaid is likely to succeed on the merits of the underlying claims in the Complaint, (2) CampMaid is likely to suffer irreparable harm in the absence of such an injunction, (3) absent the requested injunction the irreparable harm CampMaid is likely to suffer far outweighs any unjust harm the Newell Defendants may incur as a result of the injunction, and (4) an injunction against the Newell Defendants does not violate any public interest. Accordingly, for the reasons set forth herein and discussed in greater detail below, the instant Motion is justified and should be granted.

## III.    STATEMENT OF RELEVANT FACTUAL BACKGROUND

1.    All right title and interest in U.S. Patent No. 8,783,241 ("'241 Patent") was acquired by CampMaid. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 3.

2.    The '241 Patent is directed to cooking apparatus, namely, a dutch oven lid holder. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 4.

3. Since acquiring the rights to the '241 Patent, CampMaid, under Mr. Yocum's direction has developed and continues to develop manufacturing, marketing, promotion, sales and distribution for the dutch oven lid holder protected by '241 Patent. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 5.

4. No other person or entity has ownership interest or rights in the '241 Patent. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 6.

5. This case is also related to dutch oven accessory products bearing the trademark or brand name CAMPMAID used in commerce by CampMaid. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 7.

6. The CAMPMAID mark was created, adopted and used by Mr. Yocum. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 8.

7. The CAMPMAID mark has been in continuous use in commerce by Mr. Yocum or by others with his permission since at least as early as November 2013. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 9.

8. CAMPMAID is a registered trademark in connection with cookware, namely dutch oven accessories, namely, stands, lid lifters, and lid holders, U.S. Trademark Registration No. 4,610,722 ("'722 CAMPMAID Registration"). *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 10.

9. The CAMPMAID mark and '722 CAMPMAID Registration are owned by Mr. Yocum. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 11.

10. Mr. Yocum exclusively controls the use of the CAMPMAID brand in connection with products. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 12.

11. Use of the CAMPMAID mark is duly licensed to CampMaid. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 13.

12.     No other person or entity has ownership interest or rights to use the CAMPMAID mark unless authorized by Mr. Yocum or CampMaid. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 14.

13.     CampMaid designs, develops, produces, manufactures, markets, sells and distributes dutch oven products and accessories, including patented dutch oven lid holders sold bearing the CAMPMAID mark. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 15.

14.     The dutch oven lid holder sold by CampMaid bearing the CAMPMAID brand is protected by the '241 Patent ("Genuine Product"). *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 16.

15.     CampMaid's business is throughout the United States, including the state of Utah and this judicial district. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 17.

16.     In an effort to conduct its business, CampMaid and Mr. Yocum entered into a business arrangement with Darin Newell and his business Bold, Inc. (collectively "Mr. Newell"). That business arrangement sought the assistance of Mr. Newell as an at will independent sales/marketing contractor-agent with the exclusive right to promote and sell Genuine Product in the United States. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 18.

17.     In exchange for Mr. Newell's efforts to promote and sell Genuine Product and accessories in the United States, CampMaid agreed to pay Mr. Newell thirty percent (30%) of net profits of sales by Mr. Newell. CampMaid never offered Mr. Newell thirty percent (30%) ownership of CampMaid LLC: neither Darin Newell nor Bold, Inc. owns any percent share of CampMaid LLC. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 19.

18.     Pursuant to this business arrangement, during certain periods of time CampMaid and Mr. Yocum authorized Mr. Newell and another company of Darin Newell, namely, XNation, Inc. (Mr. Newell and XNation, Inc. collectively the "Newell Defendants") to assist in the importation into and sales of Genuine Product and accessories in the United States ("Authorized Product"). *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 20.

19.     Darin Newell was authorized to use CampMaid's credit card for limited expenses. However, he subsequently began using the credit card to charge the costs of shipping which the Newell Defendants were obligated to pay.  *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 21.

20.     Newell Defendants agreed to give CampMaid's German distributor leads gathered at a German Trade show.  The Newell Defendants have failed to do so.  *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 22.

21.     Over time, one or more of the Newell Defendants has sold Authorized Product under this sales arrangement.  *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 23.

22.     Over time, one or more of the Newell Defendants has received payment from its customers for the sale Authorized Product to customers under the Sales arrangement. *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 24.

23.     Over time, CampMaid established financial records in Quick Books to which Mr. Yocum had access as did Darin Newell.  Darin agreed to maintain the financial records related to the manufacture, marketing and sales of Authorized Product.  This granted Darin Newell online access to CampMaid's Quick Book's financial data bases and files.  *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 25.

24.     Over time, in order to make Mr. Newell accountable for Mr. Newell's ordering demands, CampMaid permitted Mr. Newell to order directly from CampMaid's manufacturer and to coordinate shipping to the United States subject to Mr. Newell's promise to timely pay the manufacturer and shipper from Mr. Newell's own monies/accounts for Mr. Newell's direct orders to the manufacturer.  *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 26.

25.     Over time, Mr. Newell did order directly from CampMaid's manufacturer with a promise to pay the manufacturer.  *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 27.

26.     The manufacturer did make Authorized Product and send it to Mr. Newell. *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 28.

27.     Mr. Newell received it and has sold at least some of it.  *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 29.

28.     Mr. Newell also convinced CampMaid's manufacturer to lend Mr. Newell money by representing to the manufacturer that the money would be used to bridge a short-term need for cash to further sales of CampMaid products and that whatever was lent/loaned to Mr. Newell would be repaid within a month or two.  *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 30.

29.     Over time, CampMaid allowed Mr. Newell to be the initial recipient of all revenue from sales of Authorized Products by Mr. Newell provided Mr. Newell deposited the revenue from sales of Authorized Product into a bank account designated by CampMaid.  This arrangement obligated Mr. Newell to pay CampMaid compensation on all sales of Authorized Product by the Newell Defendants.  *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 31.

30.     Over time, Mr. Newell began selling Authorized Product via Amazon.com. Initially this was not disruptive to CampMaid's business model due to small sales volumes. Over time Mr. Yocum informed Mr. Newell that sales through Amazon.com was no longer authorized because it is inconsistent with CampMaid's developing business model because it unfairly competes (requiring no shipping costs) with sales of Authorized Product through other retail customers of CampMaid (which incur additional shipping costs).  The volume of Amazon sales also caused significant, immeasurable diversion of CampMaid human resources to address customer service issues directed to CampMaid, not to Amazon.com or Mr. Newell as agreed. Thousands of customers have recently been diverted from CampMaid's established retailers to buy through Amazon.com.  This is now resulting in negative posting on Amazon which are due to back order delays and which harm CampMaid's brand good will.  This has also resulted in angry customer calls to CampMaid.  CampMaid's retail customers are unhappy about their decline in sales during the time that Amazon sales have increased.  *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 32.

31.     Over time, one or more of the Newell Defendants has withheld compensation owing to CampMaid for sale of Authorized Product under the sales arrangement. *Declaration of Kenneth Yocum ("Yocum Decl."), ¶ 33.*

32.     Over time, Mr. Newell has not deposited all revenue from sales of Genuine Product into the bank account designated by CampMaid; Mr. Newell has collected revenue and withheld revenue from CampMaid. *Declaration of Kenneth Yocum ("Yocum Decl."), ¶ 34.*

33.     Over time, Mr. Newell has not timely paid the manufacturer all monies owing for Mr. Newell's direct orders to and shipments from CampMaid's manufacturer. *Declaration of Kenneth Yocum ("Yocum Decl."), ¶ 35.*

34.     Recently, CampMaid's manufacturer has again attempted to seek payment from Mr. Newell explaining why, without payment, the manufacturer is unable to continue manufacture or ship CampMaid product. Ex. 1 (emails from manufacturer to Darin Newell, dated My 10-11, 2016). *Declaration of Kenneth Yocum ("Yocum Decl."), ¶ 36.*

35.     In response, Mr. Newell has threatened CampMaid's manufacturer that if CampMaid's manufacturer does not release certain debt to Mr. Newell in exchange for something Mr. Newell does not own, namely, thirty percent ownership in CampMaid, that Mr. Newell will simply go out of business leaving CampMaid's manufacturer with no payment. Ex. 1 (May 11, 2016 email from Darin Newell to CampMaid's manufacturer). *Declaration of Kenneth Yocum ("Yocum Decl."), ¶ 37.*

36.     CampMaid manufacturer has repeatedly demanded repayment of the loan. *Declaration of Kenneth Yocum ("Yocum Decl."), ¶ 38.*

37.     Mr. Newell has repeatedly failed to pay back the loan. *Declaration of Kenneth Yocum ("Yocum Decl."), ¶ 39.*

38.     Recently, Mr. Newell has made false and misleading statements to CampMaid's manufacturer and customers about the ability of Mr. Yocum and CampMaid to meet their

financial obligations and meet further product development and markets demands. *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 40.

39.     These statements by Mr. Newell have also included false statements about Mr. Newell and other Newell Defendants related to the sales arrangement between Mr. Newell and CampMaid. *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 41.

40.     The statements and conduct of Mr. Newell as a purported business associate of Mr. Yocum and CampMaid are harming Mr. Yocum's good will and reputation and the good will and reputation of CampMaid in the market. *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 42.

41.     Recently, Mr. Newell has interfered with the timely importation of needed CampMaid product.  Mr. Newell has caused the delay in shipment of needed CampMaid products. *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 43.

42.     In December 2015, independent of Mr. Newell, CampMaid engaged another firm to market the Authorized Products ("Recent Marketing Efforts").  The Recent Marketing Efforts caused sales of Authorized Product to soar thereby taking CampMaid to new levels of sales never previously experienced.  The success of the Recent Marketing Efforts was overwhelming causing short-term, temporary back orders which CampMaid quickly fulfilled. *Declaration of Kenneth Yocum ("Yocum Decl."),* ¶ 44.

43.     Within the last week(s) Mr. Yocum has learned that Mr. Newell has failed to pay the transoceanic shipper, Cargo-Link, designated to carry CampMaid products to the United States.  Mr. Newell's failure to pay has caused delay in shipment of product which has in turn required CampMaid to discontinue its successful marketing campaign because CampMaid does not have product to fulfill orders generated from CampMaid's successful Recent Marketing Efforts.  This is harming CampMaid's good will and reputation about being a company that can provide its advertised product in a timely way.  Timely delivery of product is vital in certain buying seasons such as now with Father's Day and summer out-door cooking upon us.  This

decrease rather than increase in business is immeasurably and negatively impacting CampMaid's business momentum, growth and market share. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 45.

44.     During the last week Mr. Yocum also learned that fabric zipper bags CampMaid sells for storing the CampMaid dutch oven products are delayed because Mr. Newell has failed to pay other shipping costs.  Without authorization from CampMaid, Mr. Newell tried to have CampMaid's storage bags shipped with unrelated, non-CampMaid products of XNation which are now held up in shipment due to nonpayment by XNation. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 46.

45.     Recently, Mr. Newell has now blocked CampMaid from full access its own Quick Books accounting data bases and files. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 47.

46.     Recently Mr. Yocum asked Mr. Newell to deposit revenue into CampMaid's designated bank account as agreed.  Mr. Newell has not done so. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 48.

47.     Recently Mr. Yocum asked Mr. Newell to pay CampMaid's manufacturer in full. Mr. Newell has not done so. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 49.

48.     Recently Mr. Yocum asked Mr. Newell to give CampMaid full access to its own Quick Books accounting data bases and files.  Mr. Newell has not done so. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 50.

49.     Recently Mr. Yocum asked Mr. Newell to discontinue sales of Authorized Product through Amazon.com.  Mr. Newell has not done so.  At that point in time, sales of Authorized Product by the Newell Defendants through Amazon.com became unauthorized sales. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 51.

50.     In consequence of the misconduct of the Newell Defendants, the sales arrangement between Mr. Newell and CampMaid was terminated thereby terminating the

sales/distribution of Authorized Product via the Newell Defendants.  *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 52.

51.     Notwithstanding the revocation of sales of Genuine Products through the Newell Defendants, now without authorization from CampMaid and from Mr. Yocum one or more of the Newell Defendants separately and/or in concert with one another or with unknown third parties have and continue to seek the manufacture, importation into, sales or offers for sale and/or use in the United States of the same dutch oven lid holder products and accessories bearing the same CAMPMAID brand ("Unauthorized Product").  *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 53.

52.     One or more of the Newell Defendants has sold Unauthorized Product. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 54.

53.     One or more of the Newell Defendants has received payment from its customers for the sale Unauthorized product to the customer.  *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 55.

54.     One or more of the Newell Defendants has withheld compensation owing to CampMaid for sale of Unauthorized Product.  *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 56.

55.     Sale of Unauthorized Product infringe one or more of claims 1-6 of the '241 Patent ("Asserted Claim(s)").  *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 57.

56.     The Newell Defendants have established channels of distribution, sales and delivery by which Unauthorized Product are sold and shipped to customers/consumers in Utah. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 58.

57.     Through Amazon.com and accounts at Amazon.com the Newell Defendants have sold and continue to sell Unauthorized Products in connection with the CampMaid name at www.amazon.com.  *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 59.

58.     The Newell Defendants conduct the sale of Unauthorized Product from their business locations in Utah. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 60.

59.     Without authorization from CampMaid, the Newell Defendants have actively induced and/or are actively inducing Amazon.com and on information and belief other third parties to sell and/or use Unauthorized Product in the United States, including in this judicial district. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 61.

60.     Unauthorized importation and sales by the Newell Defendants are done in utter disregard for CampMaid's patent rights under the '241 Patent. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 62.

61.     Unauthorized importation and sales by the Newell Defendants are done in utter disregard for Mr. Yocum's common law trademark rights and Mr. Yocum's rights under the '722 CAMPMAID Registration. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 63.

62.     Recently, Mr. Newell continues to disrupt CampMaid's business relations with its customers and warehouses.  For example, Mr. Newell has made false and misleading statement to CampMaid's German distributor.  These statements have caused confusion and concerns with CampMaid's German distributor.  These circumstances are impugning Mr. Yocum's reputation and the reputation of CampMaid with the German distributor, a circumstance which never before existed until Mr. Newell's recent statements and actions. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 64.

63.     Within the last weeks, Mr. Yocum has discovered that Darin Newell has unilaterally lowered the price he is obligated to pay me in our internal records.  Mr. Yocum has demanded correction.  Darin Newell has refused to change the prices back. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 65.

64.     Representatives of CampMaid have been established in foreign countries to develop and meet foreign market demands.  As a result, CampMaid products are being marketed in foreign countries as well. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 66.

65.     Since 2013, Mr. Yocum has made presentations to public and private meetings, groups, associations and companies to identify and nurture potential and actual clients and to educate and train customers about the superior benefits of the Authorized Product. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 66.

66.     It often takes a number of visits to educate and gain the trust and confidence of distributors and customers.  Customer service can be daunting requiring customer attention and reassurance that the product is effective and functioning properly.  All this, to build and strengthen customer relations. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 68.

67.     Since 2013, CampMaid and/or Mr. Yocum has invested years of time and money to develop and refine the Authorized Product, to educate the market, and to travel promoting its exclusive technology and rights, all this to establish relationships with manufacturers and distributors to meet customer demands.  CampMaid's potential for recouping its investment is unquantifiably injured by competitors like the Newell Defendants who market Unauthorized Product and accessories.  CampMaid is capable of supplying any known or anticipated demands for the Genuine Product.  Allowing unauthorized competitors to meet market demands with CampMaid's own proprietary technology jeopardizes the recoupment of CampMaid's investment, and interferes with its business efforts, plans and strategies, exclusive rights, and impugns its business reputation. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 69.

68.     Unauthorized sales and marketing of the Genuine Product and accessories by Defendants materially changes the nature of the market.  Unauthorized devices result in the Genuine Product and accessories being offered by more than one company.  When this happens, CampMaid and its retailers are forced to compete against CampMaid's own technology in marketing, pricing, shipping, sales and customer relations.  This is detrimental to CampMaid's reputation of being an innovator and leader in developing and offering the patented dutch oven products; CampMaid has to confront and answer questions about others offering Genuine Product.  Furthermore, CampMaid must then deal with and respond to potential customers who

- 13 -

develop contacts and relationships with Defendants because of Unauthorized Genuine Product. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 70.

69.   Unless the Court immediately enjoins the manufacture, sale or use of infringing devices caused or induced by the Newell Defendants, and the Newell Defendants' unlawful statements and retention of CampMaid property, CampMaid will be irreparably damaged and the irreparable harm will continue in what was and should remain CampMaid's exclusive market. *Declaration of Kenneth Yocum ("Yocum Decl.")*, ¶ 71.

## IV.   **IV. LEGAL STANDARD**

This Court has broad discretion under the Patent Act to enjoin patent infringement

(35 U.S.C. § 283) and other irreparable harm under Rule 65.  The Federal Circuit's precedent,

rather than any differing standards in the regional circuits,  controls in patent cases.[1] The Federal

Circuit has defined the standards applicable to motions for preliminary injunction as follows:

> A plaintiff seeking a preliminary injunction must establish [1] that he
> is likely to succeed on the merits, [2] that he is likely to suffer
> irreparable harm in the absence of preliminary relief, [3] that the
> balance of equities tips in his favor, and [4] that an injunction is in the
> public interest.[2]

All four factors are satisfied in this case.

By meeting elements (2)-(4) one "may establish likelihood of success by showing

'questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues

ripe for litigation and deserving of more deliberate investigation.'" [3]

---

[1] *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525-26 (Fed. Cir. 2012).

[2] Id. at 525 (quoting *Winter v. Natural Res. Def. Council*, Inc., 555 U.S. 7, 20 (2008)).  The standard in the Tenth Circuit and Utah State courts is nevertheless substantially similar.  *Shelbyco v. Western Trimming*, 43 USPQ2d at 1142 (D. Utah 1007)(citing *Walmer v. U.S. Department of Defense*, 52 F.3d 851, 854 (10th Cir.), *cert. denied*, 516 U.S. 974 (1995*)); Hunsaker v. Kersh*, 991 P.2d 67, 69 (Utah 1999) (A preliminary injunction is "an anticipatory remedy purposed to prevent the perpetration of a threatened wrong or to compel the cessation of a continuing one" and is "preventative in nature.").

[3] *Id.*

No one element is dispositive, each element is weighed in light of the others.[4]  Weakness in one element may be overborne by the strength of others.[5]   The burden of persuasion upon CampMaid is that of reasonable likelihood of eventual success in the litigation.[6]

A preliminary injunction may issue upon a somewhat lesser clear showing of validity and infringement.[7]   The showing is a lesser one because if the trial standard was required and made at the preliminary injunction stage, once the injunction issued there would be no need for a trial.

## V.     IV. ARGUMENT

### A.     CampMaid Is Likely to Succeed on the Merits

CampMaid patent case is straightforward and highly likely to succeed on the merits.  The Newell Defendants are selling or offering for sale the same patented dutch oven lid holder of CampMaid.

### 1.     The patent is presumed valid 35 U.S.C. 282

One is liable for patent infringement, and subject to injunctive relief, if a single claim is infringed.[8]  Section 282 of the Patent Act definitively states: "Each claim of a patent . . . shall be presumed valid."[9] This presumption exists at every stage of  the litigation, including the

---

[4] *E.g., Hybriteh, Inc. v. Abbott Labs.*, 849 F.2d 1446 (Fed. Cir. 1988).

[5] *Id.*

[6] *E.g., Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994).

[7] *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233-34 (Fed. Cir. 1985)
.
[8] *E.g., Panduit Corp. Dennison Mfg. Co.*, 836 F.2d 1329, 1330 (Fed. Cir. 1987).

[9] 35 U.S.C. § 282 (emphasis added).

preliminary injunction phase.[10] Thus, "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."[11]

2.      Infringement of the '241 Patent

CampMaid's dutch oven lid holder is covered by one or more claims of the '241 Patent as shown in the claim chart of Exhibit 1.  Without authorization from CampMaid the Newell Defendants are selling the same, patented dutch over lid holder.   Selling without authorization is infringement:  "… whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."[12]  By continuing to sell or offer for sell patented dutch oven lids without authorization from CampMaid, the Newell Defendants are infringing the '241 Patent.[13]

With a clear showing of validity and infringement, the required reasonable likelihood of eventual success on the merits has been made by CampMaid.  At a minimum, CampMaid has presented questions going to the merits so serious and substantial as to warrant preliminary injunction.[14]

---

[10] *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc*., 134 F.3d 1085, 1088 (Fed. Cir. 1998).

[11] 35 US.C. § 282.

[12] 35 U.S.C. 271(a).

[13] An infringement determination is a two-step process. First, a court must determine the scope and meaning of the asserted claims.[13] *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). Second, the court must determine whether the accused product contains every limitation of at least one asserted claim. Id.; *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014).

[14] *Shelbyco v. Western Trimming*, 43 USPQ2d at 1142.

3.    CampMaid enjoys senior common law and presumptive trademark rights

CampMaid has used the CAMPMAID mark continuously in  interstate commerce since 2013 in connection with dutch oven cooking products.  As a result, CampMaid has senior common law rights to all others.

The '722 CAMPMAID Registration on the Principal Register imbues Mr. Yocum with presumptive rights as to  the CAMPMAID mark in connection with cookware, namely, dutch oven accessories, namely, stands, lid lifters, and lid holders; dutch ovens:

> A certificate of registration of a mark upon the principal register provide by this Act shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.[15]

CampMaid has hereby made a showing of senior, exclusive trademark ownership in the CAMPMAID mark.

4.    The Newell Defendants are using CampMaid's trademark without authorization

The Newell Defendants are continuing to sell dutch oven accessories bearing the CAMPMAID mark without consent from Mr. Yocum or from CampMaid.  This constitutes trademark infringement:

> Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use likely to cause confusion, or to cause mistake, or to deceive; or

---

[15] 15 U.S.C 1057 (b).

> (b) reproduce, counterfeit, copy, or colorably imitate a registered
> mark and apply such reproduction, counterfeit, copy, or colorable imitation
> to labels, signs, prints, packages, wrappers, receptacles or advertisements
> intended to be used in commerce upon or in connection with the sale,
> offering for sale, distribution, or advertising of goods or services on or in
> connection with which such use is likely to cause confusion, or to cause
> mistake, or to deceive;
>
> shall be liable in a civil action by the registrant for the remedies
> hereinafter provided.[16]

Because Mr. Yocum and/or CampMaid have valid trademark rights in the CAMPMAID mark, and because the Newell Defendants continue to sell product, advertise and promote dutch oven accessory business using the CAMPMAID mark without consent of Mr. Yocum, Plaintiffs are likely to succeed on the merits of trademark infringement.

     5.     <u>The Newell Defendants are using improper means to interfere with CampMaid's economic relations</u>

The Newell Defendant are using false and misleading statements about CampMaid, about Mr. Yocum and about themselves to unfairly interfere with CampMaid's economic relationship with its manufacturer and other distributor(s).  Employing improper means to interfere with economic relations is a business tort subjecting the perpetrator to liability.[17]  The Newell Defendants have unleashed a barrage of communications riddled with untruths to CampMaid's manufacturer.   The Newell Defendants state:  "I HAVE MANY OTHER CUSTOMERS THAT WANT TO BUY," "we are already doing $40-50k in regular sales each month for CampMaid with over 200-300 new stores coming on, but now all this will be lost."[18]  This is false.  The Newell Defendants claim to be current in payments to CampMaid but CampMaid has not been

---

[16] 15 U.S.C. 1114 (1).  The statutory remedies include injunctive relief.  15 U.S.C. 1116 (the courts are vested with jurisdiction "to grant injunctions, according to the principles of equity ….")

[17] *Eldridge v. Johndrow*, 2015 UT 21, ¶ 14 (Utah 2015).

[18] Ex. 1 hereto.

paid for "$40-50k in regular sales each month particularly for the last three containers brought into the U.S. by the Newell Defendants"  The Newell Defendants are misleading CampMaid's manufacturer to believe that the Newell Defendants are successfully promoting and selling CampMaid products.  This is false:  CampMaid has been shown no such sales and has been paid for no such sales.  The Newell Defendants are hiding CampMaid own financial records from scrutiny.  All the while, the Newell Defendants are not paying the manufacturer and shipper.

The Newell Defendants represent that there are many other customers that want to buy and that over 200-300 new stores are coming on.  This is blatantly false.  CampMaid has repeatedly asked for sales reports and business development reports.  The Newell Defendant have provided none.  This kind of harm to economic relations cannot be undone and cannot be compensated by money damages because it requires spending unquantifiable time and effort to rehabilitate economic relations.

Darin Newell via Bold, Inc. then threatens CampMaid's Taiwan manufacturer:  "NOW I WILL HAVE TO GO TO CHINA, AND WORK WITH CHINA OFFICE."

The result of these statements is this emphatic statement from CampMaid's manufacturer to CampMaid's "exclusive" U.S. distributor-procurer, Darin Newell and Bold, Inc.: "[I] will never provide product to you."  The very "exclusive" distributor on whom CampMaid relies and through whom CampMaid is receiving product to support U.S. sales is beguiling and threatening CampMaid's manufacturer with the result that it interferes with the timely procurement of product from CampMaid's critical economic partner just before CampMaid's busiest selling season, Father's Day and summer.

    6.    <u>The Newell Defendants are not carrying out CampMaid's identified sales strategies</u>

CampMaid has identified a business model of selling its Genuine Product and accessories through established retailers.  Contrary to this policy, the Newell Defendants have and continue to work against this strategy by relying upon Internet sales through Amazon.com and Amazon.com accounts of the Newell Defendants.  The refusal of the Newell Defendants to carry out the identified sales strategy and business plan of CampMaid is improper, not a unilateral decision to be made by the Newell Defendants.  CampMaid is likely to succeed in its termination of the Newell Defendants for failure to carry out identified CampMaid business strategies.

The resulting harm to CampMaid is significant.  CampMaid's established retail accounts cannot compete with Amazon.com's superior shipping advantage.  As a result, thousands of customers have been diverted from CampMaid's established retailers to buy through Amazon.com.  There is no way to estimate how many other potential customers have been diverted from buying CampMaid product from CampMaid's established retailers, or how many customers who have been diverted away from CampMaid's retailers would have been repeat customers buying still other CampMaid dutch oven accessories from CampMaid's established resellers, all this causing an immeasurable diminishment of CampMaid business.

In any event, CampMaid's established retailers are unhappy with their reduced sales in the face online sales at Amazon.com.  Loss of established retail accounts and the loss of return customer purchases is an immeasurable loss to market penetration and market share and warrants immediate injunctive relief.

7.    The Newell Defendants are not performing the agreed upon sales
obligations

As a part of the sale arrangement, upon receipt of sales revenue the Newell Defendants
were obligated to deposit the sales revenue into an account designated by CampMaid.  The
Newell Defendants have failed to do so.  This has materially impacted CampMaid's ability to
identify and utilize revenue for use in further building the business.  The failure of this material
sales related obligation and its hampering effect on CampMaid's ongoing business is adequate
basis for either at will or cause termination.

8.    The Newell Defendants are improperly withholding valuable property of
CampMaid

The Newell Defendants have not only received all revenue from sales (initially permitted)
and not deposited into the designate account of CampMaid (not permitted), but they have
retained all revenue (property) which rightly belongs to CampMaid for its possession and use.
The Newell Defendants have not fully compensated CampMaid.  For example, for the last three
containers of Genuine Products imported into the United States, received by and sold at least in
part by the Newell Defendants, CampMaid has not been paid anything.  This is a prima facie
showing of conversion, likely to succeed on the merits.

This conversion is causing irreparable harm to CampMaid and Mr. Yocum.  Without this
revenue, the ability of CampMaid and Mr. Yocum to further grow the CampMaid business is
hampered in an inestimable way.  The money being unlawfully withheld by the Newell
Defendants precludes CampMaid and/or Mr. Yocum from using that money for additional
promotional activities, advertising, increasing or strengthening distributor relations or payment
for additional, needed manufacturing.  The value of these harms cannot be quantified.

### B.     CampMaid is Suffering Irreparable Harm

Irreparable harm in the context of a preliminary injunction is established if (1) absent an injunction, the plaintiff will suffer irreparable harm, and (2) there is a causal nexus between the alleged harm and the alleged conduct.[19]  As established above, CampMaid and Mr. Yocum are suffering and will continue to suffer irreparable harm.  But for the conduct of the Newell Defendants, CampMaid and Mr. Yocum would not be suffering or  continue to suffer this irreparable harm.  This causal connection is established by the facts presented. Unless enjoined, the conduct of the Newell Defendants will continue to cause CampMaid and/or Mr. Yocum to suffer an immeasurable loss of competitive edge, exclusive market position, business stability and good will among market suppliers and participants. CampMaid will also incur severe damage to its reputation as the pioneer and reliable provider in the outdoor cooking industry.

### 1.     Harm to Plaintiffs

Because of the market success of its patented and associated dutch oven accessories, all branded under the mark CAMPMAID, CampMaid has evolved over the years to become the exclusive source of its products sold in or from the United States.  The actions of the Newell Defendants is tarnishing CampMaid's business presence and growth, market share, economic relations, business stability, reputation and good will.

The Newell Defendants have created an artificial market in which CampMaid's established retailer must now compete with Amazon.com who holds a fulfillment advantage which CampMaid's established retailer cannot match.  This artificial market caused by the Newell Defendants has sabotaged CampMaid's forward-projecting business strategies.  An injunction from this court will right the market status CampMaid as sought to establish utilizing

---

[19] *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012).

its proprietary products and brands.  This exclusive position in the market will be lost if CampMaid's established retailer are now forced to compete with the same proprietary products and brand at an effectively lower price.  This can also cause de facto artificial pricing if CampMaid's established retailer are forced bear the burden of shipping costs at the same price in order to compete with Amazon.com and its free shipping.[20]  This diminishes the economic incentive of CampMaid's established retailers thereby harming the reputation of CampMaid products as being profitable products, whether proprietary products or associated, convoyed accessories.  This is precisely the type of harm that is irreparable.  It is well recognized that a market is rarely the same when a market of multiple sellers is suddenly converted or diverted to one with a single seller.[21]  Allowing the Newell Defendants to continue to divert Internet sales to Amazonm.com and Amazon.com accounts, or any other undercutting Internet seller is perpetuating an artificial market and  must be stopped immediately before it completely ruins CampMaid's business prospects, reputation and good will beyond recovery.

In the case of proprietary patent and trademark rights this is particularly needful.  Direct competition in the market is an important factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude.[22]  This is especially so when the patentee is practicing the invention and the parties' products are not only competing but the same products.[23]

---

[20] *Cf. Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996) ("Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option.").

[21] *Cf. Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996).

[22] *E.g., Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012).

[23] *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1344-45 (Fed. Cir. 2013).

Where patent validity and infringement is clearly shown, immediate irreparable injury can be presumed.[24]   This presumption is derived from the unique exclusionary nature of such rights.  For example:

> In matters involving patent rights, irreparable harm has been presumed when a clear showing has been made of patent validity and infringement....  This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm.  The opportunity to practice an invention during the notoriously lengthy course of patent litigation may itself tempt infringers....  The nature of the patent grant thus weighs against holding that monetary damages will always suffice to make the patentee whole, for the principal value of a patent is its statutory right to exclude.[25]

Here, the Newell Defendants are causing direct unauthorized competition for a large share of the same consumer market.  If the Newell Defendants continue to facilitate competition through infringing product, the injuries sustained over the span of this litigation will go well beyond simple money damages.   CampMaid will lose its exclusionary right and its reputation as the exclusive provider of new, innovative, affordable cookware whose unique structure and function meet its customers' needs and wants in a way no other product does.

---

[24] *Smith Int'l, Inc. v. Hughes Tool Corp.*, 718 F.2d 1573, 1581 (Fed. Cir.), *cert. denied*, 464 U.S. 996 (1983); *accord Chrysler Motors Corp. v. Auto Body Panel,* 908 F.2d 951, 954 (Fed. Cir. 1990); *American Parking Meter Advert'g Inc. v. Visual Media Inc.*, 693 F. Supp. 1253, 1255 (D. Mass. 1987), *aff'd*, 848 F.2d 1244 (Fed. Cir. 1988) ("Patents are entitled to receive special protection.   Delay [in enjoining infringers] may well become the equivalent of an involuntary license by the patent holder . . ..   Manufacture and sale of what is apparently an infringing product is irreparable harm.   If the patent is valid, and no injunction should issue, there would be a loss of good will and potential revenue on plaintiff's part."); *accord cf. Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1288-89 (10th Cir. 1996) ("[W]e join the overwhelming majority of our sister circuits and recognize a presumption of injury at the preliminary injunction stage once a copyright infringement plaintiff has demonstrated a likelihood of success on the merits."); *Foresight Resources Corp. v. Pfortmiller*, 719 F. Supp. 1006, 1010 (D. Kan. 1989) ("When a plaintiff has made out a prima facie case of infringement, irreparable harm will usually be presumed, for the purposes of injunctive relief.").

[25] *H.H. Robertson Co. v. United Steel Deck Inc.*, 820 F.2d, 384, 390 (Fed. Cir. 1987).  This shifts the ultimate burden on the question of irreparable harm on to the alleged infringer.  *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552 (Fed. Cir. 1994).

Because CampMaid is still growing, loss of business opportunities now will inalterable impact its future growth, market share, reputation and good will.[26]  That is, CampMaid is still in the process of growing the customer base for its patented products.  The '241 Patent will not expire (with granted extensions) until May 2030.  Negative impact on CampMaid's growth now cannot be converted into a measurable loss over the remaining life of the '241 Patent; infringement by the Newell Defendants now will hinder CampMaid's ability to reach its anticipated market position in ways that are impossible to quantify or compensate with money damages.

Should CampMaid lose its manufacturer, it would require retooling or even starting all over with new molds and the associated machines in order to obtain product.  This delay could cause CampMaid to be unable to meet customer demand in the coming sales seasons.

In this instance, the threat of untimely manufacturing and receipt of product is glaring.  If the Newell Defendants are taken for their word that they will close business, the hope of receiving any monetary compensation after a trial on the merits becomes illusory, thus underscoring the need to enjoin the irreparable injury now so that Plaintiffs are not denied both a profitable ongoing business and any monetary relief at the conclusion of the merits.  This confirms the premise that the availability of preliminary relief is based on the premise that the remedy available at the end of trial will not make the plaintiff whole.

Moreover, courts routinely enter preliminary injunctions to prevent the consumption, dissipation or conveyance of the assets that the party pursuing preliminary relief seeks to recover

---

[26] *E.g., Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 269 F.3d 1149, 1156-57 (10th Cir. 2001)(harm to reputation and credibility caused by untimely business delays).

in the underlying litigation.[27]   The Newell Defendants are receiving revenue from the sale of

Genuine Product, at least $40-50k per month.  However, the Newell Defendants are not turning

that revenue over to CampMaid or even giving CampMaid its share.  It appears the revenue is

being consumed elsewhere.  The Newell Defendants admit that "THE BANK TOOK IT ALL

TO PAY OTHER SUPPLIERS."[28]   Apparently the Newell Defendants have many debts which

are consuming their revenue, including the revenue from the sale of CampMaid's Genuine

Products.  The financial inability of a defendant to satisfy a money judgment can constitute

irreparable injury.[29]   In is inequitable that CampMaid should be left with a ruined business and

no monetary remedy at the end of day.  Hence, the need for injunctive relief now so CampMaid

can regroup, recover and regain what the Newell Defendants have and are unfairly hampering or

threatening to hamper.

        Immediate injunctive relief is needed because once the price is artificially pushed down

by infringers or by otherwise unauthorized sales, higher pre-existing price levels and market

share are often not recoverable.[30]   By virtue of inducing a de facto lowering of the ultimate cost

born by the consumer by arranging sales through Amazon.com, the conduct of the Newell

Defendants warrants preliminary injunctive relief.

---

[27] *See Elliott v. Kiesewetter,* 98 F.3d 47, 54 (3rd Cir. 1996) (finding irreparable injury based on "showing that
without the preliminary injunction, plaintiffs will probably be unable to recover those funds").
[28] Ex. 1.

[29] *Tri-State Generation & Transmission Ass'n. v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir. 1986)(
"If Tri-State cannot collect a money judgment, then failure to enter the preliminary injunction would irreparably
harm it.").

[30] *See Sanofi-Synthelabo v. Apofex, Inc.*, 470 F.3d 1368, 1382 (Fed. Cir. 2006) (no err in relying on patentee's
testimony that it is nearly impossible to restore the patented product to a higher price once offered at a lower cost to
the buyer).

2.      The Newell Defendants are the cause of the irreparable harm to Plaintiffs

As established above, the foregoing irreparable harms are connected to the Newell

Defendants' unauthorized and continued sale of Genuine Product, their communications to

manufacturers, their failure to deposit and share revenue and their failure to conduct business

consistent with CampMaid's chosen business model.  In this case there is direct competition for

the sale of the same product.  This connection is confirmed by the fact that other traditional dutch

oven lid holders and accessories have been the market for decades yet when presented with

CampMaid new, unique dutch oven accessories, the consumer purchases the CampMaid

product(s).  This causal link is ubiquitous.

## C.      The Balance of Hardships Strongly Favors a Preliminary Injunction

The balance of hardships in this case also weighs in favor of granting a preliminary

injunction to stop the prejudicially unfair conduct of the Newell Defendants.  On this factor, the

Court "must balance the harm that will occur to the moving party from the denial of the

preliminary injunction with the harm that the non-moving party will incur if the injunction is

granted."[31]  As explained above, Plaintiffs will suffer debilitating, irreparable harm if a

preliminary injunction is not granted.  CampMaid was the exclusive provider of its patented

invention under its proprietary brand.  That status quo should be preserved.  The Newell

Defendants are seeking to alter that status by their unlawful and unfair conduct.  This reveals that

the harm the Plaintiffs suffer and will continue to suffer in the absence of a preliminary

injunction greatly outweighs any harm the Newell Defendants might experience if a preliminary

injunction is granted.

The Federal Circuit has consistently held that the balance of hardships will tip in favor of

---

[31] *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988).

the patentee when an accused infringer knows of a patent yet chooses to infringe.[32]  The Newell Defendants took a "calculated risk" in continuing to market the Genuine Product without authorization from CampMaid and Yocum.[33]  If the Newell Defendants wish to sell dutch oven accessories, they many non-infringing alternatives to make and sell.  CampMaid is not requesting that the Court enjoin such noninfringing activities.[34]  "One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."[35]

### D.     The Public Interest Favors a Preliminary Injunction

The public interest weighs heavily in favor of enjoining the unlawful conduct of the Newell Defendants.  There is a strong public policy favoring the enforcement of patent and other rights to encourage innovation and respect for validly issued patents.[36]  For example as with the patent system generally, this policy not only promotes scientific discovery and innovation, but it also protects the types of investment-based risks that CampMaid and Mr. Yocum took here.[37]  The public interest factor "nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions."[38]  CampMaid is the practicing entity.  The Newell Defendants are trying to hijack CampMaid's

---

[32] *E.g., Celsis In Vitro*, 664 F.3d at 931.

[33] *Id.*

[34] *Douglas Dynamics*, 717 F.3d at 1345 ("[T]he balance of hardships would suggest that [the accused infringer] should halt infringement and pursue a lawful course of market conduct.").

[35] *Windsurfing Int'l Inc. v AMF*, Inc.. 782 F.2d 995, 1003 n.12 (Fed, Cir- 1986).

[36] *E.g, PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996).

[37] See *Sanofi-Synthelabo*, 470 F.3d at 1383.

[38] *Apple*, 801 F.3d at 1365.

business.  There appear to be no countervailing public policy reasons in this case for denying Plaintiffs' request for and an immediate and preliminary injunction.[39]

Similarly, the public interest at stake in a trademark infringement matter is the public's right to be free of confusion as to the source of goods or services offered by sellers.[40] There is no countervailing public interest as to the Newell Defendants' unauthorized use of the CAMPMAID mark.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for a temporary restraining order and preliminary injunction to enjoin the unlawful and prejudicially unfair conduct of the Newell Defendants.

DATED this 20th day of May, 2016.

KIRTON & McCONKIE

By: ___ s/Todd E. Zenger _____
        Todd E. Zenger

Attorney for Plaintiffs
CampMaid, LLC and Kenneth Yocum

---

[39] 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.4 (3d ed. 2013)( Courts in patent, copyright, and trademark actions "have granted preliminary relief finding that the public interest in encouraging inventions and creative developments by protecting exclusionary rights and in avoiding consumer confusion supported preliminary injunctive relief.").

[40] *Amoco Oil Co. v. Rainbow Snow Inc.,* 809 F.2d 656, 658 (10th Cir. 1987) (The Lanham Act protect the public from deception by accurately indicating the source of a product).